Paul E. BETTENCOURT, M.D.,
Plaintiff, Appellant,

v.

BOARD OF REGISTRATION IN MEDICINE OF the COMMONWEALTH OF MASSACHUSETTS, et al., Defendants, Appellees.

No. 89–2041.

United States Court of Appeals,
First Circuit.

Heard March 8, 1990.

Decided May 31, 1990.

As Amended June 1, 1990.

Lee J. Dunn, Jr., with whom Dunn & Auton, Richard W. Mable and Powers & Hall, Professional Corporation, Boston, Mass., were on brief, for plaintiff, appellant.

Richard M. Brunell, Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

LEVIN H. CAMPBELL, Chief Judge.

After notice and a hearing, the state board of registration revoked plaintiff's license to practice medicine, and plaintiff petitioned for review of the board's determination to the state's highest court. While his state review petition was still pending, plaintiff brought this civil rights action in the federal district court, alleging that the board's action had violated his constitutional rights and seeking reinstatement of his medical license as well as damages. The district court dismissed plaintiff's action on numerous grounds, including *Younger* abstention. We affirm.

## I. BACKGROUND

### A. *The Board of Registration in Medicine*

The Board of Registration in Medicine for the Commonwealth of Massachusetts (the "Board") consists of five physicians and two lay persons who are appointed by the governor for three-year terms. *See* Mass.Gen.L. ch. 13, § 10. The Board's primary responsibility is to regulate the practice of medicine in Massachusetts. *See* Mass.Gen.L. ch. 112, § 5; Mass.Regs.Code tit. 243, §§ 1.00 to 2.09. One way in which it fulfills this responsibility is to resolve complaints concerning its licensed physicians. *See* Mass.Gen.L. ch. 112, § 5; Mass. Regs.Code tit. 243, § 1.03.

Upon receiving a complaint from a person or organization charging a physician with misconduct, the Board proceeds generally as follows. A "Complaint Committee," composed of at least one member of the Board, reviews the complaint and decides whether there is reason to believe that the alleged act occurred and whether it amounted to a sanctionable violation. *See* Mass.Regs.Code tit. 243, § 103(9). If the Complaint Committee finds in the affirmative on both questions, it recommends that the Board issue an order to show cause, thereby initiating an adjudicatory proceeding. *See id.*

The Board appoints a "hearing officer" to conduct an adjudicatory proceeding according to the procedures set forth in the Massachusetts Administrative Procedures Act, Mass.Gen.L. ch. 30A, and the Standard Adjudicatory Rules of Practice and Procedure, Mass.Regs.Code tit. 801, §§ 1.00, *et seq. See* Mass.Regs.Code tit. 243, § 1.04. These proceedings allow the two adverse parties—the Board prosecutor and the charged physician (who is commonly represented by counsel)—to present evidence, cross-examine witnesses, make objections, bring motions, and make oral arguments to the hearing officer. The latter makes all decisions regarding the admission or exclusion of evidence and any other procedural matters. *See* Mass.Regs.Code tit. 801, § 1.01(10)(f)(1), § 1.01(10)(d). After the hearing, the hearing officer issues a "tenta-

tive decision" in writing, consisting of a statement of reasons and a determination of the factual and legal issues, together with a recommended sanction if the officer deems one to be necessary. *See* Mass. Regs.Code tit. 801, § 1.01(10)(n)(1). A copy of the hearing officer's tentative decision is sent to the physician, and a hearing transcript is made available to the physician. *See id.;* Mass.Regs.Code tit. 801, § 1.01(10)(k). The physician may file an objection to the hearing officer's tentative decision. *See* Mass.Regs.Code tit. 801, § 1.01(10)(n)(1).

The Board then reviews the hearing officer's decision and issues its own "final decision," which also contains a statement of reasons and a determination of the factual and legal issues. *See* Mass.Regs.Code tit. 801, § 1.01(10)(n)(2). In making its factual determinations, the Board must give "substantial deference" to the hearing officer's credibility determinations, *see Morris v. Board of Registration,* 405 Mass. 103, 111, 539 N.E.2d 50, 54 (1989), but is free to "revise or reject the findings of a hearing officer on conflicting evidence." *Id.* The legal issues, which the Board decides *de novo,* serve as precedents for future cases. *See Arthurs v. Board of Registration,* 383 Mass. 299, 418 N.E.2d 1236, 1246 (1981). If the Board finds that the physician has engaged in improper conduct, it chooses one of several available sanctions, including revocation, suspension, or cancellation of the physician's license. *See* Mass.Regs. Code tit. 243, § 1.05(2). In choosing a sanction, the Board is not bound by the hearing officer's recommendation. *See Feldstein v. Board of Registration,* 387 Mass. 339, 439 N.E.2d 824, 826 (1982).

A physician who is unsatisfied with the Board's decision may petition directly to the Massachusetts Supreme Judicial Court ("SJC") for review. *See* Mass.Gen.L. ch. 112, § 64, and ch. 30A, § 14. The SJC is the highest court in the Commonwealth of Massachusetts. The SJC has authority under state law to set aside or modify the Board's decision if it determines that the substantial rights of any party have been prejudiced because the agency decision is (1) in violation of constitutional provisions; (2) in excess of the statutory authority or jurisdiction of the agency; (3) based upon an error of law; (4) made upon unlawful procedure; (5) unsupported by substantial evidence; (6) unwarranted by the facts as found by the SJC on the record; (7) arbitrary and capricious; (8) an abuse of discretion; or (9) otherwise not in accordance with law. *See* Mass.Gen.L. ch. 30A, § 14(7). Although judicial review is generally confined to the record, the SJC may take testimony with respect to alleged irregularities in the procedure before the agency. *See* Mass.Gen.L. ch. 30A, § 14(5). The court also has discretion, before deciding, to order the Board to take and send up additional evidence. *See id.,* § 14(6).

### B. *Plaintiff's Experience Before the Board*

Until his license was revoked on January 4, 1989, Dr. Paul E. Bettencourt, the plaintiff in this action, held privileges at the Faulkner Hospital, Lemuel Shattuck Hospital, and Hunt Memorial Hospital. He specialized in pulmonary disease, internal medicine, and critical care.

On February 17, 1988, the Board issued a show cause order, alleging that plaintiff had engaged in improper conduct with a patient in violation of various Massachusetts laws and Board regulations. *See, e.g.,* Mass.Gen.L. ch. 112, § 5(c); Mass. Regs.Code tit. 243, § 1.03(5)(a)(3) (conduct that places into question competence to practice medicine), Mass.Regs.Code tit. 243, § 1.03(5)(a)(18) (misconduct in the practice of medicine), Mass.Gen.L. ch. 112, § 2 (conduct evidencing a lack of good moral character). Specifically, it was charged that Dr. Bettencourt had engaged in homosexual relations with a particular patient over a 10–month period. The matter was referred to a hearing officer.

On March 7, 1988, plaintiff filed an answer to the complaint, in which he denied all the charges.

In the summer of 1988, the hearing officer conducted an adjudicatory hearing on the merits of the complaint. Following the hearing, the hearing officer issued a Recommended Final Decision and Order calling

for the complete revocation of plaintiff's license to practice medicine. On November 15, 1988, plaintiff filed objections to the recommended decision.

On January 4, 1989, the Board adopted the hearing officer's recommended decision in full and ordered the immediate revocation of plaintiff's license to practice medicine.

On February 2, 1989, plaintiff petitioned the SJC for review of the Board's decision pursuant to Mass.Gen.L. ch. 112, § 64, and ch. 30A, § 14. In his petition, plaintiff alleged that the Board's action (1) violated his rights to due process of law under both the Massachusetts and the United States Constitutions; (2) constituted an "unlawful procedure" under Mass.Gen.L. ch. 30A, § 14(7)(d); (3) lacked substantial evidentiary support under Mass.Gen.L. ch. 30A, § 14(7)(e); (4) constituted an "abuse of discretion" under Mass.Gen.L. ch. 30A, § 14(7)(g); and (5) constituted an "error of law" under Mass.Gen.L. ch. 30A, § 14(7)(c) by virtue of the Board's "bias, prejudice, and prejudgment."

Plaintiff also filed numerous motions with the Board, asking it to reconsider its decision and to stay its final order. On April 5, 1989, the Board denied plaintiff's motions.

## C. *The Current Federal Action*

On April 7, 1989, while his appeal of February 2 was pending before the SJC,

plaintiff brought this civil rights action in the district court against the Board, its members,[1] and three members of the Board's staff,[2]. In his complaint, plaintiff alleged that defendants, while acting under color of state law, (1) had deprived Dr. Bettencourt of his due process and equal protection rights in violation of 42 U.S.C. § 1983; (2) had conspired to deprive him of those rights in violation of 42 U.S.C. § 1985; and (3) knew or should have known that their conduct would serve to deprive him of his rights and neglected to prevent such a deprivation in violation of 42 U.S.C. § 1986. Plaintiff sought an injunction (pursuant to 42 U.S.C. § 1988) ordering the Board to return his license, a declaratory judgment declaring the Board's decision to be in violation of federal law, compensatory damages, attorney's fees, and $500,000 in punitive damages.

A principal claim of plaintiff's is that the Board violated his right to due process by judging him guilty of misconduct *prior to* issuing the show cause order, "thereby rendering any subsequent hearing meaningless." Plaintiff asserts that the Board prejudged him in accordance with an established policy (as expressed by the Chief of the Board's Disciplinary Unit, Peter Clark[3] in remarks that were later criticized as inaccurate by the Board's chairman, Andrew Bodnar[4]) of prejudging *all* physicians whose cases make it past the complaint

---

1. The Board members are Andrew G. Bodnar, M.D., J.D. (Chairman); Ralph A. Deterling, Jr., M.D.; Marian J. Ego, J.D., Ed.D; Marianne N. Prout, M.D.; Dinesh Patel, M.D.; Paul G. Gitlin, J.D.; and Louise L. Liang, M.D.

2. The staff members are Peter Clark, Chief of the Board's Disciplinary Unit; Andrew Hyams, General Counsel for the Board; and Barbara Neuman, the Board's Executive Director.

3. Plaintiff's complaint refers to comments made by Clark on two different occasions. First, on December 5, 1986, while testifying before the Massachusetts Division of Insurance, Clark presented an estimate of the annual number of disciplinary actions, revocations, and suspensions, and allegedly testified that "if we don't meet these numbers, then that would represent a professional and personal failure on my part." Second, on January 23, 1988, while addressing the Massachusetts Bar Association, Clark allegedly stated, among other things, that (1) the

Board acts as the police, prosecution, grand jury, petit jury, "and to a certain extent, even the appellate judge;" (2) the Board is not constrained by "the constitutional notions of protecting people from self-incrimination;" (3) the Board does not "give Miranda warnings and as a result we do get much information from uncounseled or poorly counseled physicians;" (4) the Board's elaborate screening process makes it highly unlikely that, once a complaint reaches the hearing stage, "the Board will find either that the facts alleged will not be proven ... or that the facts, if proven, do not warrant some kind of disciplinary action...."; and (5) the Board will exercise its discretion in a physician's favor only if he "is relatively supine when confronted with the Board's majesty...."

4. Plaintiff's complaint refers to a June 1, 1988 letter written by Chairman Bodnar to Clark, stating that the chairman was writing, "after lengthy and often difficult deliberation, and

committee. In addition, plaintiff complains of numerous procedural errors made at the hearing, "including but not limited to the limitation upon plaintiff's cross-examination of the Board's witnesses and the erroneous admission of irrelevant and prejudicial evidence."

Apart from his due process challenge, plaintiff contends that the Board discriminated against him, in violation of the equal protection clause and the privileges or immunities clause of the Fourteenth Amendment, on the basis of his sexual preference.

On May 1, 1989, defendants filed a motion to dismiss, stating that (1) the district court lacked jurisdiction to hear plaintiff's appeal from the Board's decision; (2) the Eleventh Amendment bars the suit against the Board; (3) the principles of claim and issue preclusion extinguish plaintiff's causes of action; (4) the court must abstain; (5) plaintiff failed to state a claim upon which relief could be granted; and (6) the individual defendants are entitled to absolute (or qualified) immunity from plaintiff's claims for monetary relief. Defendants also filed a motion to stay plaintiff's various requests for discovery.

On May 22, 1989, the district court granted defendants' motion to stay discovery. On September 20, 1989, the court dismissed plaintiff's action on the following grounds: lack of subject matter jurisdiction, *Younger* abstention, *Burford* abstention, equitable abstention, the Eleventh Amendment, and absolute immunity. *Bettencourt v. Board of Reg. in Medicine*, 721 F.Supp. 382 (D.Mass.1989).[5]

Plaintiff appeals.

## II. YOUNGER ABSTENTION

Underlying our federal system is a presumption that the state courts are as capable as their federal counterparts of guaranteeing federal rights. *See Middlesex Eth-*

*ics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1981) ("Minimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights.") (emphasis deleted); *Sumner v. Mata*, 449 U.S. 539, 549, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981) ("State judges as well as federal judges swear allegiance to the Constitution of the United States, and there is no reason to think that because of their frequent differences of opinions as to how that document should be interpreted, all are not doing their mortal best to discharge their oath of office."); *Swain v. Pressley*, 430 U.S. 372, 383, 97 S.Ct. 1224, 1231, 51 L.Ed.2d 411 (1977) ("[E]lected judges of our state courts are fully competent to decide federal constitutional issues...."); *Stone v. Powell*, 428 U.S. 465, 493–94 n. 35, 96 S.Ct. 3037, 3051–52, n. 35, 49 L.Ed.2d 1067 (1975) ("[W]e are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several states.").

Related to this presumption of equal competency is the concept of comity, which counsels federal courts to be sensitive to the existence of a parallel system of state governance. *See Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971) (Comity entails "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."); *Marcal Paper Mills, Inc. v. Ewing*, 790 F.2d 195, 196 (1st Cir.1986) (Comity counsels "respect for both enforcement of state laws and the ability of state

---

with the concurrence of a majority of the Board's membership: *a) to disavow, on behalf of the Board; b) to reject as a statement of accurate reflection of Board principles or policies; and c) to rebut,* the overall thrust and implications of your comments before the midyear meeting of the Massachusetts Bar Associa-

tion (MBA) on January 23, 1988...." (emphasis in original).

5. The court did not address defendants' arguments regarding claim or issue preclusion, failure to state a claim upon which relief could be granted, and qualified immunity.

courts to give proper attention to federal law defenses.").

■ One of the many ways federal courts demonstrate comity is by refusing to grant relief whenever doing so would interfere substantially with ongoing state judicial proceedings. In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that the federal courts must defer to ongoing state *criminal* proceedings. Since *Younger*, deference has been similarly required to ongoing, originally state-initiated [6] *civil* or even *administrative* proceedings that satisfy three conditions: (1) the proceedings are judicial (as opposed to legislative) in nature; (2) they implicate important state interests; and (3) they provide an adequate opportunity to raise federal constitutional challenges. *See Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1981) (civil proceedings); *Ohio Civil Rights Comm'n v. Dayton Schools*, 477 U.S. 619, 627–29, 106 S.Ct. 2718, 2722–24, 91 L.Ed.2d 512 (1985) (administrative proceedings). Here, we agree with the district court that *Younger* abstention is plainly required.

## A.  Ongoing State Proceedings

■ In determining whether federal proceedings would interfere with *ongoing* state proceedings, the proper point of reference is the date plaintiff filed his federal complaint. *See, e.g., Liedel v. Juvenile Court of Madison County, ALA*, 891 F.2d 1542, 1546 n. 6 (11th Cir.1990) ("The date of filing of the federal complaint is the relevant date for purposes of determining *Younger*'s applicability."); *Beltran v. State of California*, 871 F.2d 777, 782 (9th Cir.1988) (same); *DeSpain v. Johnston*, 731 F.2d 1171, 1178 (5th Cir.1984) (same); *cf. Pennzoil v. Texaco*, 481 U.S. 1, 17, 107 S.Ct. 1519, 1529, 95 L.Ed.2d 1 (1987) (analyzing *Younger* abstention as of the time

the case was filed in federal court); *Marcal Paper Mills, Inc. v. Ewing*, 790 F.2d 195, 195 (1st Cir.1986) (same).

Plaintiff filed his present federal complaint *after* he had petitioned the SJC to review the Board's decision to revoke his license. Were the district court to grant any of the forms of relief sought by plaintiff—whether that be (1) an injunction ordering the Board to return Dr. Bettencourt's license; (2) a declaratory judgment declaring the Board's action to be in violation of federal law; or (3) a ruling in support of an award of money damages—the effect would be to disrupt substantially the review proceedings now pending before the SJC. An injunction could "immobilize" the state proceedings. *See United Books, Inc. v. Conte*, 739 F.2d 30, 33 (1st Cir.1984) (preliminary injunction enjoining future prosecutions "might immobilize the state [appellate] proceedings or lead to a 'rush to judgment' to foreclose estoppel."). A declaratory judgment would "actually resolve an issue central to that appeal." *Id. See also Samuels v. Mackell*, 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971) (basic policy against federal interference with pending state proceedings "will be frustrated as much by a declaratory judgment as it would be by an injunction."). And a ruling in support of an award of money damages "would embarrass, and could even intrude into, the state proceedings." *Guerro v. Mulhearn*, 498 F.2d 1249, 1253 (1st Cir.1974). *See also Deakins v. Monaghan*, 484 U.S. 193, 108 S.Ct. 523, 533, 98 L.Ed.2d 529 (1988) (action for monetary relief creates as much interference with state proceedings as does action for injunctive or declaratory relief) (White, J. concurring) [7]; *Mann v. Jett*, 781 F.2d 1448, 1449 (9th Cir.1986) (per curiam); *Parkhurst v. State of Wyoming*, 641 F.2d 775, 777 (10th Cir.1981).

---

**6.** In one case, the Supreme Court invoked *Younger* abstention even though the ongoing civil proceedings were not initiated by the state. *See Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 14 n. 12, 107 S.Ct. 1519, 1527 n. 12, 95 L.Ed.2d 1 (1986).

**7.** The Supreme Court has left open the question whether *Younger* abstention applies to damages actions. *See Deakins*, 484 U.S. 193, 108 S.Ct. 523, 529 n. 6, 98 L.Ed.2d 529 (1988); *Juidice v. Vail*, 430 U.S. 327, 339 n. 16, 97 S.Ct. 1211, 1219 n. 16, 51 L.Ed.2d 376 (1976).

We need not consider the result here had plaintiff brought his federal action without petitioning for review to the SJC. *Cf. Kercado–Melendez v. Aponte–Roque*, 829 F.2d 255, 258–63 (1st Cir.1987) (plaintiff who chose not to appeal state administrative board's decision may bring civil rights challenge in federal court), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988); *see also Thomas v. Texas State Bd. of Medical Examiners*, 807 F.2d 453, 456 (5th Cir.1987) (similar); *see generally Duty Free Shop v. Administration De Terrenos*, 889 F.2d 1181, 1183 (1st Cir.1989) (purpose behind *Younger* abstention is a "reluctance to interfere with an *ongoing* state judicial proceeding.") (emphasis added). In the present case, plaintiff's SJC petition is currently pending; for us to act now would clearly interfere with an ongoing judicial proceeding. *See New Orleans Public Serv. v. Council of New Orleans*, —— U.S. ——, 109 S.Ct. 2506, 2521, 105 L.Ed.2d 298 (1989) (administrative proceedings that are "judicial in nature ... should be regarded as 'ongoing' for the purposes of *Younger* abstention until state appellate review is completed....") (Rehnquist, J. concurring) (citing *Ohio Civil Rights Comm'n v. Dayton Schools*, 477 U.S. 619, 629, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1985)).

### B. *Three–Part Test for Younger Abstention*

As stated *supra*, the Supreme Court has formulated a three-part inquiry to determine what kind of ongoing, noncriminal, state-initiated proceedings are entitled to a federal deference. *See Middlesex County Ethics Committee*, 457 U.S. at 432, 102 S.Ct. at 2521; *Dayton Schools*, 477 U.S. at 627–29, 106 S.Ct. at 2722–24 (1985). Without question the ongoing SJC review petition meets that test. First, the SJC proceedings are, of course, "judicial in nature" in that they involve "[a] judicial inquiry [that] investigates, declares and enforces

liabilities as they stand on present or past facts and under laws supposed already to exist." *New Orleans Public Service v. Council of New Orleans*, 109 S.Ct. at 2519 (quoting *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)).

Second, the issues at stake—involving the enforcement of proper standards of medical licensure—obviously implicate important state interests. *See Thomas v. Texas State Board of Medical Examiners*, 807 F.2d 453, 455 (5th Cir.1987) ("[T]he state, through its Bd. of Medical Examiners, possesses a great interest in the outcome of the litigation, for it seeks to assure the competency of physicians who practice in its borders."); *Cf. Middlesex*, 457 U.S. at 434–35, 102 S.Ct. at 2522–23 (attorneys); *Allen v. Louisiana State Bd. of Dentistry*, 835 F.2d 100, 103 (5th Cir.1988) (dentists); *Parker v. Commonwealth of Kentucky Bd. of Dentistry*, 818 F.2d 504, 508 (6th Cir.1987) (same).

Finally, the review proceedings before the SJC provide an adequate opportunity to raise federal constitutional challenges. *See Dayton Schools*, 477 U.S. at 629, 106 S.Ct. at 2723 ("[I]t is sufficient under *Middlesex* that constitutional claims may be raised in state-court judicial review of the administrative proceeding."). The SJC reviews the Board's decisions in part for constitutional error, *see* Mass.Gen.L. ch. 30A, § 14(7), and is permitted to gather evidence "in cases of alleged irregularities in procedure before the agency [when those irregularities are] not shown in the record." Mass.Gen.L. ch. 30A, § 14(5). In the past the SJC has overturned the Board's decisions on due process grounds, *see, e.g., Morris v. Board of Reg. in Medicine*, 405 Mass. 103, 110, 539 N.E.2d 50, 54 (1989) (vacating Board decision because proceedings "denied [the physician] fairness in a due process sense."). There is no question of the SJC's ability to address and resolve the federal constitutional challenges in this case.[8]

---

8. Plaintiff apparently argues that the district court erred in abstaining under *Younger* because his federal claims are "entirely separate and distinct" from the issues raised in his petition for relief to the SJC. The facts, however, belie this argument: plaintiff's federal claims are *not* "entirely separate and distinct" from the issues raised in the SJC petition. In both instances plaintiff asserts *federal* due process violations. Moreover, it would not matter for pur-

Moreover, contrary to plaintiff's implicit assertions, it is immaterial to the court's duty to abstain under *Younger* that the SJC may reject plaintiff's arguments. *See Duty Free Shop v. Administracion De Terrenos*, 889 F.2d 1181, 1183 (1st Cir.1989) (a party who is "already engaged in a state proceeding, cannot ordinarily obtain a hearing in federal court on its federal claim simply because it believes the state will reject the claim on the merits.").

We find no merit in plaintiff's reliance upon this court's decision in *Planned Parenthood League of Mass. v. Bellotti*, 868 F.2d 459 (1st Cir.1989). A declaration was sought in *Bellotti* that the Massachusetts courts were applying in an unconstitutional manner a Massachusetts statute that required minors to obtain parental consent or judicial approval prior to obtaining abortions. The district court abstained under both *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Younger*.

We reversed the district court's rulings on both grounds. With regard to *Burford* abstention, which we defined in *Bath Memorial Hospital v. Maine Health Care Fin. Com'n*, 853 F.2d 1007, 1012 (1st Cir. 1988), as the avoidance of an "awkward circumstance of turning the federal court into a forum that will effectively decide a host of detailed state regulatory matters, to the point where the presence of the federal court, as a regulatory decision-making center, makes it significantly more difficult for the state to operate its regulatory system[,]" we observed that "[i]f plaintiffs succeed, what will occur is not an ongoing intermeddling with the state judiciary but a prohibition of an unconstitutional process." *Bellotti*, 868 F.2d at 465. *See also Bath Memorial Hospital*, 853 F.2d at 1013 ("The threatened interference [in *Burford* ab-

stention cases] did not consist merely of the threat that the federal court might declare the *entire state system* unconstitutional; that sort of risk is present whenever one attacks a state law on constitutional grounds in a federal court.") (emphasis in original). With regard to *Younger* abstention, we held that *Younger* did not apply because there was no "*state-initiated proceeding*, criminal or civil, to enjoin." *Bellotti*, 868 F.2d at 467 (emphasis added).

Here, unlike in *Bellotti*, the request to interfere with the SJC review of a state-initiated proceeding clearly implicates *Younger* abstention. As for *Burford* abstention, we do not address it, hence we need not decide whether the relief plaintiff seeks constitutes "a prohibition of an unconstitutional process" as opposed to "an ongoing intermeddling." *See generally Bath Memorial Hosp. v. Maine Health Care Fin. Com'n*, 853 F.2d at 1012–13 (discussing *Burford* and *Younger* abstention).

### C. *Exceptional Circumstances*

■ In unusual circumstances, a plaintiff may secure relief in the federal courts—even though doing so would interfere with ongoing state-initiated proceedings—by demonstrating "bad faith, harassment, or any other unusual circumstance that would call for equitable relief." *Younger v. Harris*, 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1972). *See generally United Books, Inc. v. Conte*, 739 F.2d 30, 34 (1984) ("These exceptions to *Younger's* policy of abstention have been very narrowly construed by the Court."). The Supreme Court found one of these "unusual circumstances," permitting federal-court interference, to have occurred when a state administrative board was so constituted as to be fundamentally biased. *See Gibson v. Berryhill*, 411 U.S. 564, 577,

poses of *Younger* abstention whether plaintiff *did in fact* raise his federal challenges before the SJC. The question is whether plaintiff *could have* raised such challenges. *See Duty Free Shop v. Administracion De Terrenos*, 889 F.2d 1181, 1183 (1st Cir.1989) ("[I]t is only where, for procedural or other reasons, the state courts deprive the plaintiff of such an *opportunity* that *Younger* does not apply.") (emphasis in original); *cf. Simopoulos v. Virginia State Bd. of*

*Medicine*, 644 F.2d 321, 330 (4th Cir.1981) (Plaintiff whose license is suspended by a state medical board may not "bifurcate his appeal, submitting only state issues to the state court and federal constitutional claims to the federal court in his proceedings in district court...."). Review of the relevant Massachusetts law makes it clear that plaintiff was free to present any of his federal constitutional challenges to the SJC.

93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1972). Here, plaintiff does not contend that any of the above "unusual circumstances" is present. Having failed to raise the issue, plaintiff has waived it. *Cf. Friends of Children v. Matava,* 766 F.2d 35, 37 (1st Cir.1985) ("[A]ppellant cannot here attack a district court's discretionary equitable 'abstention' by pointing to a factor not expressly argued to the district judge."); *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979).

Nonetheless, even had plaintiff sought to rest upon *Gibson v. Berryhill,* we would still affirm the district court's decision to abstain. An injunction was granted in *Gibson* to enjoin for fundamental bias the ongoing proceedings of a state board of optometry. Relief was allowed while the optometry board's proceedings were still in progress. State judicial review had not been instituted. Plaintiff here is not simply asking a federal court to enjoin an allegedly flawed administrative process. Rather, he is asking the district court to interfere with proceedings now in progress before a state judicial tribunal as to which claims of irregularity by the Board do not apply. *Gibson* is thus inapposite.[9]

To be sure, the Supreme Court stated in *Gibson* that a court should not defer to an unconstitutionally biased (administrative) tribunal even if "judicial review, *de novo* or otherwise, would be forthcoming at the conclusion of the administrative proceedings." *Gibson,* 411 U.S. at 577, 93 S.Ct. at 1697. The question before the Court in *Gibson,* however, was whether the district court was required to *"defer to the Board"* when doing so would countenance the board's own unconstitutional conduct. Here, unlike in *Gibson,* plaintiff waited until *after* the Board had rendered its decision, and after his review petition to the SJC had been filed, before he brought this federal action. The district court is not being asked to defer to *future* or contemporaneous unconstitutional conduct. Plaintiff's case is for the alleged *past* denial of due process and equal protection, a claim which the SJC, having jurisdiction, is equally competent to entertain.

For the facts of the instant case to parallel those of *Gibson,* plaintiff would have had to sue *before the Board's hearings occurred.* The district court then would have evaluated plaintiff's allegations of bias on the part of the board members, and determined whether *Gibson v. Berryhill* allowed the district court to entertain plaintiff's action. *Cf. Standard Alaska Production Co. v. Schaible,* 874 F.2d 624, 629 (9th Cir.1989) (bias exception inapplicable when plaintiffs fail to utilize state tribunal's disqualification procedures); *Peterson v. Sheran,* 635 F.2d 1335, 1341 (8th Cir. 1980) (similar).[10]

We, therefore, affirm the district court's decision to abstain under *Younger* from interfering with the SJC proceedings. *See Simopoulous v. Virginia State Bd. of Medicine,* 644 F.2d 321, 327 (4th Cir.1981) (*Younger* abstention appropriate "since there is pending an appeal to the State

---

**9.** In light of plaintiff's failure to cite *Gibson* below or on appeal, we must assume plaintiff agrees with this assessment.

**10.** Without deciding the issue, we note that it is questionable whether plaintiff's allegations of bias rise to the level of a federal constitutional violation. In *Gibson,* the Court rested its holding of unconstitutional bias on the fact that the administrative board members all possessed a "substantial pecuniary interest" in the outcome of proceedings in which they served as adjudicators. *Gibson,* 411 U.S. at 579, 93 S.Ct. at 1698. Here, plaintiff makes no such allegation of a manifest conflict of interest. *Cf. Hammond v. Baldwin,* 866 F.2d 172, 177 (6th Cir.1989) (because plaintiffs "have alleged no personal pecuniary interest on the part of any particular officials who were to preside over their claims ...,

*Gibson* simply is inapposite"). Rather than alleging *structural* bias, plaintiff alleges *actual* bias on the part of the Board members, *i.e.,* that the Board members actually prejudged the facts of his case. To prevail on such a claim, plaintiff would have to overcome the presumption that the Board members are "'men [and women] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Withrow v. Larkin,* 421 U.S. 35, 55, 95 S.Ct. 1456, 1468, 43 L.Ed.2d 712 (1974) (quoting *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)); *see also Partington v. Gedan,* 880 F.2d 116, 124 (9th Cir.1989). It is not at all clear that the allegations in plaintiff's complaint overcome this presumption.

Circuit Court from the decision of the Board of Medicine in refusing a revocation of plaintiff's suspension."); *Damino v. O'Neill,* 702 F.Supp. 949, 953–54 (E.D.N.Y. 1987) (similar); *cf. Huffman v. Pursue, LTD,* 420 U.S. 592, 608, 95 S.Ct. 1200, 1210, 43 L.Ed.2d 482 (1974) ("Intervention at the later [appellate] stage is if anything more highly duplicative, since an entire trial has already taken place, and it is also a direct aspersion on the capabilities and good faith of state appellate courts.").

## III. IMMUNITY

Ordinarily, a decision to abstain under *Younger* results in a dismissal of the federal action. *See Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973) (*"Younger v. Harris* contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts."); *Beltran v. State of Cal.,* 871 F.2d 777, 782 (9th Cir.1988) (same). Because the proceedings before the SJC do not involve a claim for damages, however, to affirm the district court's dismissal of plaintiff's complaint solely on *Younger* grounds would arguably subject plaintiff to the risk that the statute of limitations might run on his damages claims. *See Torres v. Superintendent of Police of Puerto Rico,* 893 F.2d 404, 407 (1st Cir. 1990). Thus, absent another ground for upholding the district court's dismissal, the proper course of action could be (1) to affirm the dismissal of plaintiff's claims for injunctive and declaratory relief; and (2) to direct the district court to stay rather than dismiss plaintiff's claims for monetary relief. *See Deakins v. Monaghan,* 484 U.S. 193, 108 S.Ct. 523, 529, 98 L.Ed.2d 529 (1988) (Even if *Younger* applies to federal actions seeking only monetary relief, "the District Court has no discretion to dismiss rather than to stay claims for monetary

relief that cannot be redressed in the state proceeding."); *Landrigan v. City of Warwick,* 628 F.2d 736, 743 (1st Cir.1980).

■ In the present case, however, we do not order a stay of plaintiff's damages claims, because other grounds exist for upholding the district court's dismissal of them, namely, (1) the doctrine of sovereign immunity bars the recovery of damages from the Board, and the Board members and their staff in their official capacities; and (2) the doctrine of quasi-judicial immunity bars the recovery of damages from the Board members and their staff in their individual capacities.[11]

### A. *Sovereign Immunity*

The district court held that the Eleventh Amendment bars plaintiff's claims for damages against the Board and the Board members and their staff in their official capacities. On appeal, plaintiff has not challenged this aspect of the district court's ruling, and we decline, therefore, to disturb it.[12] *See Fleury v. Clayton,* 847 F.2d 1229, 1230 (7th Cir.1988) (noting that all parties agree that the Eleventh Amendment bars an award of damages against members of the state medical disciplinary board in their official capacities); *Horwitz v. Bd. of Med. Examiners of State of Colo.,* 822 F.2d 1508, 1510 (10th Cir.1987) ("The Board was dismissed from the suit by virtue of the State's claim of sovereign immunity. That ruling is not challenged on appeal."), *cert. denied,* 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987); *Emory v. Texas State Bd. of Medical Examiners,* 748 F.2d 1023, 1025 (5th Cir.1984) (similar). Plaintiff does challenge the district court's ruling that the doctrine of "quasi-judicial" immunity bars plaintiff's damages action against defendants in their *individual* capacities. We turn next to this issue.

**11.** The individual defendants are immune from plaintiff's action for *damages;* they are *not* immune from plaintiff's action for declaratory or injunctive relief, nor are they immune from an award of attorney's fees under 42 U.S.C. § 1988. *See Pulliam v. Allen,* 466 U.S. 522, 544, 104 S.Ct. 1970, 1982, 80 L.Ed.2d 565 (1983).

**12.** Plaintiff's arguments regarding the Eleventh Amendment relate solely to whether his claims for *equitable* and *declaratory* relief are barred by the Eleventh Amendment. As we state in note 15, *infra,* our decision to abstain makes it unnecessary for us to reach this issue.

## B. *Quasi–Judicial Immunity*

■ Although the Supreme Court has been "quite sparing" in its grants of absolute immunity, *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988), the Court has recognized that "there are some officials whose special functions require a full exemption from liability." *Butz v. Economou*, 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1977). Such officials include, among others, judges performing judicial acts within their jurisdiction, *see, e.g., Pierson v. Ray*, 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1966), prosecutors performing acts "intimately associated with the judicial phase of the criminal process," *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1975), and certain "quasi-judicial" agency officials who, irrespective of their *title*, perform *functions* essentially similar to those of judges or prosecutors, in a setting similar to that of a court. *Butz v. Economou*, 438 U.S. 478, 511–17, 98 S.Ct. 2894, 2913–16, 57 L.Ed.2d 895 (1977). *See generally Cleavinger v. Saxner*, 474 U.S. 193, 199–202, 106 S.Ct. 496, 499–501, 88 L.Ed.2d 507 (1985) (reviewing doctrine of quasi-judicial immunity); *Scott v. Central Maine Power Co.*, 709 F.Supp. 1176, 1181–84 (D.Me.1989) (same). We must consider here whether the district court correctly determined that defendants fall within this latter category. We hold that it did.

Plaintiff does *not* challenge the district court's finding that, while engaging in the activities criticized herein, the Board members and their staff were acting in their "quasi-judicial", *i.e.*, adjudicatory, capacity. *Cf. Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 545, 98 L.Ed.2d 555 (1988) (judge not entitled to absolute immunity for the "administrative" act of dismissing an employee). Nor does plaintiff suggest that the Board acted in the "clear absence of all jurisdiction," *Stump v. Sparkman*, 435

U.S. 349, 357, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1977) (quoting *Bradley v. Fisher*, 13 Wall. 335, 351, 20 L.Ed. 646 (1872)), or that the staff members were acting outside the "outer perimeter" of their sphere of duty. *See Ricci v. Key Bancshares of Maine, Inc.*, 768 F.2d 456, 462 (1st Cir.1985) ("The conduct in question need only be more or less connected to the 'general matters committed by law to his control or supervision' and not 'manifestly or palpably beyond his authority' ".) (quoting *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896)); *cf. Chalkboard Inc. v. Brandt*, 879 F.2d 668, 671 (9th Cir.1989) (no absolute immunity for members of state department of health who went beyond their authority when summarily closing day care center).

Rather, plaintiff's criticism of the district court's immunity ruling is based on the argument that, as a matter of public policy, members of a state medical board (and their staff) when fulfilling a quasi-judicial role should not be granted absolute immunity from damages suits.

### 1. *Board Members*

Because plaintiff is suing the Board members for actions taken in their adjudicative (as opposed to legislative) capacities, we restrict our analysis to the Board's role as adjudicators.[13] *See, e.g., Scott v. Central Maine Power Co.*, 709 F.Supp. 1176, 1187 (D.Me.1989) ("Even though by statute a state agency official at various times may perform legislative, executive and judicial functions, each of which may entitle the official to a different level of immunity, the functional approach to immunity requires that actions taken in the performance of a particular function are to be accorded the level of immunity appropriate to that *function*.") (emphasis in original); *see generally Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 583 n. 3, 98 L.Ed.2d 619 (1988) ("[T]his Court has long favored a 'function-

---

**13.** We view plaintiff's claims against the Board members as centering on their roles as adjudicators. To the extent the claims relate to the Board members' roles as "public" prosecutors, *Werle v. Rhode Island Bar Ass'n*, 755 F.2d 195, 198–99 (1st Cir.1985), we agree with the district

court that the Board members' actions were intimately connected with the advocacy phase of the judicial process. *See id.; Horwitz v. Bd. of Med. Examiners of State of Colo.*, 822 F.2d 1508, 1515 (10th Cir.), *cert. denied*, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987).

al' inquiry—immunity attaches to particular official functions, not to particular offices.").

Proper analysis involves answering three questions, each designed to determine how closely analogous the adjudicatory experience of a Board member is to that of a judge. First, does a Board member, like a judge, perform a traditional "adjudicatory" function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does a Board member, like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect a physician's constitutional rights? *See Butz v. Economou*, 438 U.S. 478, 510–13, 98 S.Ct. 2894, 2912–14, 57 L.Ed.2d 895 (1977); *Austin Mun. Securities v. Nat. Ass'n of Securities*, 757 F.2d 676, 688 (5th Cir.1985); *Simons v. Bellinger*, 643 F.2d 774, 778 (D.C.Cir.1980). We answer each question in the affirmative.

First, the role of a Board member is indeed "functionally comparable" to that of a judge: he weighs evidence, makes factual and legal determinations, chooses sanctions, writes opinions explaining his decisions, serves a set term (three years), and can be removed only for cause. *See Horwitz v. Bd. of Med. Examiners of State of Colo.*, 822 F.2d 1508, 1515 (10th Cir.1987) (As judges, medical board members function in adjudicatory roles.); *Manion v. Michigan Bd. of Medicine*, 765 F.2d 590, 596 (6th Cir.1985) (similar); *cf. Cleavinger v. Saxner*, 474 U.S. 193, 204, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985) (denying absolute immunity to prison disciplinary board members who "are employees of the Bureau of Prisons and ... are the direct subordinates of the warden[,] who reviews their decision").

Second, the act of revoking a physician's license—which bars the physician from practicing medicine in the Commonwealth of Massachusetts—is likely to stimulate a litigious reaction from the disappointed physician, making the need for absolute immunity apparent. *See Horwitz*, 822 F.2d at 1515 ("There exists a strong need to insure that individual board members perform their functions for the public good without harassment or intimidation."); *cf. Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1966) ("It is a judge's duty to decide all cases ..., including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption.").

Finally, enough safeguards exist to "enhance the reliability of information and the impartiality of the decisionmaking process...." *Butz*, 438 U.S. at 512, 98 S.Ct. at 2913. In Massachusetts medical licensure proceedings, the parties litigate in the context of a sophisticated, truly adversarial process, established by state statutory law and regulations. *See* Mass.Regs.Code tit. 243, § 1.04. The physician may be represented by counsel. There is a Board prosecutor. There is a transcribed record, to which the physician is given access. The hearing officer issues a written tentative decision. The regulations permit oral and documentary evidence as well as cross-examination. The Board itself issues a written opinion, relying on its own precedent, as well as that of the state and federal courts. The Supreme Judicial Court of Massachusetts directly reviews the Board's decisions for error. These and other safeguards indicate that enough checks on malicious action by Board members exist to warrant a grant of absolute immunity for the Board members' actions in their adjudicatory capacities. *See Horwitz*, 822 F.2d at 1515 ("There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance on private damages lawsuits."); *cf. Cleavinger v. Saxner*, 474 U.S. 193, 204, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985) (no absolute immunity for prison disciplinary board members who adjudicate free from various procedural safeguards, including, the right to counsel, cross-examination, a transcript, and direct judicial re-

view); *Cutting v. Muzzey,* 724 F.2d 259, 262 (1st Cir.1984) (members of town planning board not entitled to judicial immunity for acts involving "the routine exercise of administrative discretion ..., an exercise untrammeled by any requirements as to a hearing, precise standards, a record of evidence, and substantial evidence review").

Accordingly, following *Butz v. Economou,* we hold that absolute immunity bars plaintiff's claims for damages against the Board members acting in their "quasi-judicial" capacities.[14] *See Horwitz v. Bd. of Med. Examiners of State of Colo,* 822 F.2d 1508, 1515 (10th Cir.), *cert. denied,* 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 394 (1987) (members of state board of medical examiners entitled to absolute immunity for actions taken to discipline physician); *Hoke v. Bd. of Medical Examiners of the State of N.C.,* 445 F.Supp. 1313, 1316 (W.D. N.C.1978) (similar); *cf. Johnson v. Rhode Island Parole Bd. Members,* 815 F.2d 5, 8 (1st Cir.1987) (parole board members); *Reed v. Village of Shorewood,* 704 F.2d 943, 951 (7th Cir.1983) (members of local liquor control commission); *Simons v. Bel-*

linger, 643 F.2d 774, 778 (D.C.Cir.1980) (members of committee on unauthorized practice of law); *Scott v. Central Maine Power Co.,* 709 F.Supp. 1176, 1188 (D.Me. 1989) (chairman of public utilities commission); *Hicks v. Georgia State Bd. of Pharmacy,* 553 F.Supp. 314, 318 (N.D.Ga.1982) (pharmacy board members). *But see Manion,* 765 F.2d 590, 596 (6th Cir.1985) (no absolute immunity for members of state medical license board performing "licensure functions including investigating and initiating disciplinary proceedings and holding hearings in connection with these proceedings").[15]

## 2. *Staff Members*

■ For reasons similar to those given in support of a grant of absolute immunity to Board members for their actions in an adjudicatory capacity (the disciplinary process is functionally comparable to the judicial process, the danger of vexatious lawsuits from dissatisfied physicians is great, and sufficient safeguards exist to protect physicians' rights), we hold that the three

---

14. The few first circuit precedents cited by plaintiff in support of his argument are unavailing. For example, plaintiff contends that "as this Court itself recognized in *Knight v. Mills,* 836 F.2d 659 (1st Cir.1987), at most the defendants in this case may assert a claim of qualified immunity from liability." We reject plaintiff's interpretation of this case. In *Knight,* a psychiatric patient brought a section 1983 action against a former state commissioner of health and a state treatment center administrator, alleging that defendants had violated his due process rights by refusing to provide him with psychological treatment. We held that the two state officials "are entitled to qualified immunity and are therefore not liable for civil damages." *Id.* at 672. Nowhere in the opinion, however, did we consider whether or not defendants were entitled to a grant of absolute immunity. Indeed, on the presented facts of that case, it is unclear what argument could have been made in support of a grant of absolute immunity to the state officials, who were clearly not acting in a "quasi-judicial" capacity. *Knight* (and the other first circuit cases cited by plaintiff) are irrelevant to the present case.

15. We agree with the Sixth Circuit that "[o]fficials who seek absolute immunity must squarely shoulder the burden of showing that public policy demands an exemption of that scope." *Manion,* 765 F.2d at 596. We find, however, that

defendants have met this burden by showing that (1) their positions are akin to that of judges; (2) the potential for vexatious lawsuits is great; and (3) enough safeguards exist to protect a physician's constitutional rights.

A similar position has been adopted by a majority of courts, *see, e.g., Horwitz,* 822 F.2d at 1515, *Hicks,* 553 F.Supp. at 318, *Hoke,* 445 F.Supp. at 1316, and, in our view, it comports well with the Supreme Court's holding in *Butz* that federal hearing examiners are entitled to absolute immunity:

In light of these safeguards, we think that the risk of an unconstitutional act by one presiding at an agency hearing is clearly outweighed by the importance of preserving the independent judgment of these men and women. We therefore hold that persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts. Those who complain of error in such proceedings must seek agency or judicial review.

*Butz,* 438 U.S. at 514, 98 S.Ct. at 2914. That defendants are members of a *state* (as opposed to federal) board is immaterial. *See id.* at 504, 98 S.Ct. at 2909 ("[W]e deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.").

staff members are also entitled to absolute immunity from damages liability for their actions in the present case.

Plaintiff's complaint alleges that defendant Hyams "participated with the Hearing Officer or the Board members in writing the Final Decision and Order in this case in violation of the plaintiff's due process and equal protection rights." We find that, just as a law clerk is entitled to absolute immunity from damages actions based on his participation in the decision of a particular case, *see, e.g., Slotnick v. Staviskey,* 560 F.2d 31, 32 (1st Cir.), *cert. denied,* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1977); *Oliva v. Heller,* 839 F.2d 37, 40 (2d Cir.1988), defendant Hyams should receive absolute immunity for his actions as legal adviser in plaintiff's case before the Board.

■ The remaining allegation against the staff members is that they met with members of the Board to determine "how the Board could affect [sic] the discipline, sanctioning and punishment of more individuals licensed by it or otherwise subject to [its] control irrespective of whether they had committed acts which justified such punishment." This allegation relates to the heart of the adjudicatory process—*the decision to sanction*—and we find that, whether acting as legal advisers, *see supra,* or "public" prosecutors, *see Werle v. Rhode Island Bar Ass'n,* 755 F.2d 195, 199 (1st Cir.1985), the staff members are entitled to quasi-judicial immunity for their actions in allegedly helping the Board members establish the "policy" of sanctioning all physicians regardless of their guilt.[16] *See Haynesworth v. Miller,* 820 F.2d 1245, 1268–70 (D.C.Cir.1987) (absolute immunity attaches to prosecutor's decision to establish policy of retaliatory prosecution).

## IV. CONCLUSION

In summary, we hold that (1) *Younger v. Harris* requires the dismissal of plaintiff's claims for injunctive and declaratory relief; (2) the Eleventh Amendment bars plaintiff's claim for damages against the Board, and the Board members and their staff in their official capacities; and (3) quasi-judicial immunity bars plaintiff's claims for damages against defendants in their individual capacities.[17]

AFFIRMED.

---

16. We find that the Board members and their staff are entitled to absolute immunity in spite of plaintiff's charge of an ongoing "conspiracy" to deprive physicians of their rights. *Cf. Dennis v. Sparks,* 449 U.S. 24, 27, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980) (judge absolutely immune from suit alleging conspiracy between judge and private parties). Plaintiff makes no argument that his conspiracy charge is of the kind that might extinguish a grant of absolute immunity. *See Malachowski v. City of Keene,* 787 F.2d 704, 711 (1st Cir.) ("While proper allegations of conspiracy could overcome the immunity, *see San Filippo v. U.S. Trust Co. of New York, Inc.,* 737 F.2d 246, 256 (2d Cir.1984), appellants' allegations, again, are wanting."), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *cf. Scott v. Schmidt,* 773 F.2d 160, 164 (7th Cir. 1985) ("Were we to permit actions against judges or those performing judicial functions merely on allegations that the decision-maker was predisposed toward a case[,] we would open a floodgate of litigation from all those dissatisfied with a decision. Appellate process is the proper avenue for such dissatisfied litigants.").

17. Our dismissal on the basis of *Younger* abstention of plaintiff's claims for equitable and declaratory relief makes it unnecessary for us to review the district court's other grounds for dismissing these claims, such as the Eleventh Amendment, the *Rooker–Feldman* doctrine, *Burford* abstention, and equitable abstention. Moreover, by dismissing plaintiff's claims for damages on the grounds of sovereign immunity and absolute immunity, we need not address the various alternative arguments offered by defendants in support of an affirmance, namely issue preclusion, claim preclusion, failure to state a claim upon which relief can be granted, and qualified immunity. *See Duty Free Shop v. Administration De Terrenos,* 889 F.2d 1181, 1183 (1st Cir.1989); *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1349–50 (1st Cir.1989); *Casagrande v. Agoritsas,* 748 F.2d 47, 48 n. 1 (1st Cir.1984).